Brock *v.* Ct. & Passumpsic Rivers Railroad Co.

## HORATIO BROCK *v.* THE CONNECTICUT AND PASSUMPSIC RIVERS RAILROAD COMPANY.

### [IN CHANCERY.]

#### *Railroads. Chancery. Injunction.*

A railroad corporation, being obliged by their charter to fence their road, for the purpose of constructing a permanent fence along their track through the orator's meadow land, which was liable to be overflowed, commenced to plant willow trees on each side of their track upon the land used by them for railroad purposes, and within three feet of the orator's line, with the expectation that they would grow and be used to attach boards to, thus making a fence, which, in the judgment of the officers of the corporation, would be more permanent, serviceable and economical, than one constructed in any other manner. It having been proved that such trees, by growing and spreading their roots into, and their branches over, the orator's land, would be a serious injury thereto, and that there was no controlling necessity for the construction of a fence in that particular manner, *it was held*, that the corporation might properly be enjoined, by a court of chancery, from planting such trees.

BILL IN CHANCERY. The orator alleged in his bill that the defendants had, by virtue of their charter, taken a portion of his meadow land in Newbury, five rods in width and seventy-five rods in length, and had built their railroad thereon, and had fenced and occupied the same, for some time previous to the bringing of the bill, for railroad purposes; that the orator's land along the defendants' railroad, and on both sides thereof, was occupied by him for purposes of tillage and mowing, and was very valuable for such uses; that the defendants had commenced to plant great numbers of trees along each side of their railroad, about three feet from the line of the strip of land taken by them from the orator as aforesaid; that such trees when grown would cause great and permanent injury to the orator's land; that the roots spreading into the soil would greatly obstruct tillage and ploughing, and the tops would shade and spoil the orator's land to a considerable distance, and would cause great and irreparable injury to the orator; and that no such use of the orator's land was ever named or considered in the appraisal of damages for the taking of the land by the defendants for railroad purposes under their charter, but that such use was

new, unusual, and entirely unwarranted. The bill prayed for an injunction to restrain the defendants from proceeding farther in the setting of such trees along the orator's land, and a temporary injunction to that effect was granted by the chancellor.

The defendant's answer set forth that a portion of the land enclosed and used by them for railroad purposes adjoining the orator's meadow, was taken by them from the orator under their charter, and the damages for such taking were duly appraised and paid by them to the orator, and that the remainder was purchased by the defendants of various persons, and that the defendants had received from such persons duly executed deeds thereof; that the duty was imposed by law upon the defendants to build and keep in repair a sufficient fence on each side of their track; that the orator's land was mostly low meadow, and subject to be overflowed in times of high water to such an extent, as to carry away the fences constructed in the ordinary way; that the defendants had in such cases sometimes tried the experiment of a fence upon the railroad embankment, but that such fence was in the way of clearing the snow from the embankment in the winter season, and that the embankment was liable to be so washed away by heavy rains as to allow cattle to pass under the fence upon the track; that, with such experience, the defendants had caused willow stakes to be set along the margin of the strip used by them for railroad purposes, adjoining the orator's meadow, on each side of their track, and about three feet from the orator's land, with the expectation that they would take root and grow, and that boards would be nailed to these stakes, and a fence thereby constructed, which would withstand the high water floods; that such a fence, as the defendants proposed thus to construct, would also be beneficial as a kind of *breakwater* to protect the railroad embankment from the action of the floods; that it was not possible in any other manner, by any reasonable expenditure, to maintain a sufficient fence along their road through the orator's land, as required by law; and that such willow trees, as set by the defendants, would not, to any appreciable extent, injure the orator or his land.

This answer was traversed, and testimony was taken on both

sides, the general balance of which is sufficiently stated in the opinion of the court.

The cause was tried upon its merits, before Chancellor POLAND, who rendered a decree that the temporary injunction be made perpetual, and that the orator recover his costs, from which decree the defendants appealed.

*Peck & Colby*, for the orator.

*T. P. Redfield*, for the defendants.

PIERPOINT, J. This bill is brought to restrain the defendants from planting and continuing willow trees along the line of their road, on each side, through the land of the orator, and upon or close to the division line between the railroad and the orator's land.

The orator alleges in the bill that said trees are planted within a few feet of each other, and so near to the division line that, if they are permitted to remain, in a few years they will extend their branches over, and their roots into, the land of the orator, that sprouts will spring up therefrom in the orator's soil, that dead and broken branches will be deposited thereon, and a shade so cast upon it, that the land of the orator for a considerable distance back from the line of the railroad will be so exhausted and injured as to be rendered nearly value-less for the purpose of cultivation.

The defendants in their answer admit the planting of the trees, with the intention of having them remain and grow, and with the purpose, when they shall have attained sufficient size, to attach boards to them, and thus make a fence along the sides of their road. They allege that the land on which their road is laid, is in many places low, and in periods of high water is overflowed to such an extent as to make it difficult to maintain a fence constructed in any of the ordinary modes, and they deny all improper motives in planting the trees, and they also deny that any such injury is likely to ensue to the orator therefrom, as he has alleged in his bill. The defendants also allege in the answer that such a fence as they contemplate, will be beneficial

to them as a protection to their embankments in certain low places, where in high water they are liable to be washed away.

In the course of the argument it has been conceded on both sides, that the defendants have planted willow trees along a large portion of their road; and that other land owners have also commenced proceedings to restrain them from so doing; and that this case comes here as a *representative* case, for the purpose of settling the question as to them all.

From a consideration of all the testimony which has been introduced on both sides, we are of the opinion that the orator has established the fact by a fair balance of testimony, that the planting and continuance of the trees and their growth, as designed and contemplated by the defendants, would produce the injuries to the orator which he has alleged in his bill would result therefrom.

The question then arises, have the defendants a right to plant and cultivate a row of willow trees on each side of their road, through the orator's land, in the manner and for the purposes contemplated, notwithstanding the great injury that must inevitably ensue to the orator therefrom? The defendants surveyed their road across the orator's land, under and by virtue of their charter. Whether they obtained it all by proceedings *in invitum*, or whether a part was transferred to them by deed, would seem to be immaterial, so far as this question is concerned. They obtained it for the purpose of constructing and operating a railroad. By their charter the company were bound to fence their road, and it was in view of this obligation that the price to be paid was fixed upon by the commissioners or the parties, but evidently neither party contemplated that the road was to be fenced in this unusual and extraordinary manner, in a way that should virtually destroy or render nearly worthless an amount of land along the sides of the road nearly, if not quite, equal to the amount taken, and that, too, by the introduction into the farms of the willow tree, which some of the witnesses represent as the common enemy of the farmer in that vicinity, and one with which they have been contending half their lives, a tree that most of the witnesses seem to consider as injurious to the surrounding land, to an extent beyond that of most other trees.

Whether one of two adjoining land owners, holding their titles in fee, and for the ordinary purposes of cultivation, would have the right to construct a fence in this manner on the line between them, to the manifest injury of the other, is a question we are not now called upon to decide.

But we think, in order to justify the railroad company in resorting to this method of fencing their road, in view of its effect upon the adjoining proprietor, there must be some strong and controlling necessity for their doing so.

And we are wholly unable to find from the evidence the existence of any such necessity. There would seem from the testimony, to be no great difficulty, with but slight additional expense, in constructing a fence in the ordinary form, that would withstand the freshets that the fences on this road are subject to.

This case is not like the case of *Brainard* v. *Clapp*, 10 Cushing 6. There the action was brought for cutting trees by the corporation that stood within the line of their road. This they had an undoubted right to do, if they judged best. That they might, and probably would, do this, all must have contemplated at the time the land was taken, and if any damage would ensue therefrom, it was embraced in the award of damages. The act was in accordance with the ordinary practice in such cases, and could produce no injury to the soil of the adjoining proprietor.

In regard to the power of a court of chancery to interfere, we think the authorities are clear that the court does possess the power. Story, in his work on Equity Jurisprudence, says, section 928 : " There can not be the slightest hesitation, that if the acts done, or threatened to be done, would be ruinous, or irreparable, or would impair the just enjoyment of the property in future, a court of chancery would interfere. Indeed, if courts of equity did not interfere in cases of this sort, there would be a great failure of justice in the country."

The decree of the chancellor is affirmed, with costs, and the case remanded to the court of chancery.